ZACHARY LINOWITZ, ESQ. (State Bar No. 287368)
LINOWITZ LAW
1300 Clay Street, Suite 600
Oakland, CA 94612
Phone: 510-519-1401
zachary@linowitzlaw.com
*Attorney for Plaintiffs*

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| I.P.C., a minor, by and through her mother and next friend Christina Pallas, individually and as successor in interest to JOSE JAVIER PINA CARDENAS, deceased;<br>A.G.C., P.C., and S.C., minors, by and through their guardian and next friend Karen Glover, individually;<br>A.P.C., a minor, by and through her guardian and next friend Lydia Pina Luna, individually;<br><br>       Plaintiffs,<br><br>vs.<br><br>COUNTY OF ALAMEDA, a public entity;<br>DOE CUSTODIAL STAFF 1–50,<br><br>       Defendants. | 3:25-cv-04127-WHO<br><br>**PLAINTIFFS' FIRST AMENDED COMPLAINT FOR DAMAGES**<br><br>JURY TRIAL DEMANDED |

## INTRODUCTION

1.       This action arises from the preventable death of Jose Pina Cardenas, a 31-year-old man with serious psychiatric and medical disabilities who died in Alameda County's custody in June 2022. During his booking into Santa Rita Jail, Decedent reported hearing voices urging him to harm himself and told staff he "thinks he will do something" when back in his cell. He was placed on intensive observation status, yet for nearly 80 minutes, deputies failed to respond as surveillance cameras captured him collapsing on the floor after swallowing his jail-issued wristband, writhing in distress, and bleeding from the nose and mouth. Rather than summon medical care, deputies falsely logged him as "talking" or "sleeping," and for the final hour before he was discovered, they did not check on him even cursorily. When jail staff finally intervened, they restrained him, covered his head with a spit hood, and treated his obvious medical crisis as disobedience instead of an emergency. He was admitted to the hospital in critical condition with acute respiratory failure and aspiration pneumonia, which progressed to MRSA sepsis and multi-organ failure, culminating in his death in intensive care on June 7, 2022.

2.       The Alameda County Sheriff's Office concealed these events from the family for years by deliberately obscuring its own role in the tragedy. ACSO's Coroner's Bureau issued an autopsy labeling the death a "complication of alcohol withdrawal" despite hospital records showing respiratory distress, aspiration, and sepsis. Meanwhile, ACSO withheld body-worn camera recordings and observation logs revealing deputies' deliberate falsifications. These actions occurred against the backdrop of the federal consent decree in *Babu v. Ahern*, which had already found systemic failures in psychiatric care and monitoring at Santa Rita Jail. Decedent's preventable death exemplifies those very failures. Decedent's minor children bring this action to obtain accountability, damages, and systemic relief under both federal and California law.

**JURISDICTION AND VENUE**

3.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 (federal question), and 28 U.S.C. § 1343(a)(3) and (4), as this action is brought to redress the deprivation of rights secured by the Constitution and laws of the United States, including 42 U.S.C. § 1983, Title II of the Americans with Disabilities Act, and Section 504 of the Rehabilitation Act. The Court has supplemental jurisdiction over state law claims pursuant to 28 U.S.C. § 1367.

4.      Venue is proper under 28 U.S.C. § 1391(b) because all events and omissions occurred in Alameda County, California.

**PARTIES AND PROCEDURE**

5.      Plaintiffs I.P.C., A.G.C, P.C., S.C., and A.P.C. are the five minor children of JOSE JAVIER PINA CARDENAS ("Decedent") and residents of the State of California. Plaintiff I.P.C. brings this action by and through her mother and next friend, CHRISTINA PALLAS, who is competent to represent her interests in this matter. Plaintiffs A.G.C, P.C., and S.C. bring this action by and through their guardian and next friend, KAREN GLOVER, who is competent to represent their interests in this matter. Plaintiff A.P.C. brings this action by and through her guardian, grandmother, and next friend, LYDIA PINA LUNA, who is competent to represent her interests in this matter. Declarations establishing the authority of each guardian pursuant to Federal Rule of Civil Procedure 17(c) are attached hereto as Exhibit A.

6.      Collectively, Plaintiffs bring this action under 42 U.S.C. § 1983 and California state law to redress violations of their own constitutional and statutory rights. Plaintiffs bring this action in the public interest to help deter systemic violations of civil rights against similarly situated individuals subjected to unlawful and discriminatory conditions of confinement. In addition, Plaintiff I.P.C., in her capacity as successor in interest to Decedent, asserts survival

claims under Title II of the Americans with Disabilities Act, 42 U.S.C. § 12132, Section 504 of the Rehabilitation Act, 29 U.S.C. § 794, and California law. A declaration pursuant to California Code of Civil Procedure § 377.32 has been executed by I.P.C. to establish her standing as successor in interest under California law and is attached hereto as Exhibit B. A copy of Decedent's certificate of death is attached hereto as Exhibit C.

7.     Defendant COUNTY OF ALAMEDA ("COUNTY") is a public entity established by the laws of the State of California, which owns, operates, manages, directs, and controls the ALAMEDA COUNTY SHERIFF'S OFFICE ("ACSO") and SANTA RITA JAIL ("SRJ"), and which employs other Defendants in this action.

8.     Defendants DOE CUSTODIAL STAFF 1–50 are deputy sheriffs, sergeants, classification officers, medical-contract personnel, and supervisors employed by ACSO whose identities are currently unknown due to Defendants' exclusive control of personnel files, jail records, and body-worn camera videos. Plaintiffs will seek leave to amend this Complaint to show their true names and capacities when the same are ascertained. At all relevant times, each Defendant acted under color of state law and pursuant to the customs, policies, practices, and procedures of Defendant COUNTY.

9.     To the extent necessary, Plaintiffs plead the claims in this complaint in the alternative, as permitted by Federal Rule of Civil Procedure 8(d)(2).

## FACTUAL ALLEGATIONS

### Decedent's Psychiatric Disabilities

10.     Prior to May 17, 2022, ACSO possessed extensive records documenting Decedent's psychiatric conditions. His jail medical file reflected:

(a) diagnoses of schizophrenia, bipolar disorder, and multiple personality disorder;

(b) a documented history of suicide attempts; and

(c) a prescription history that included antipsychotic medications.

11.     These records placed Defendants on actual notice that Decedent was at heightened risk for psychiatric decompensation and suicide.

12.     Upon booking at SRJ on May 17, 2022, Decedent reported to intake staff that he was hearing voices telling him to hurt himself or others. He expressly endorsed suicidal ideation, telling a nurse "he thinks he will do something when he goes back to his cell."

13.     Based on this presentation, Decedent was "urgently" referred to Adult Forensic Behavioral Health (AFBH). Clinicians immediately placed Decedent on an Intensive Observation Log (IOL) for heightened monitoring, requiring direct visual checks every 15 minutes, documentation of any missed checks, and prompt involvement of medical and mental health staff if his condition deteriorated.

**First Use of Force**

14.     At approximately 7:20 p.m., Decedent finished his booking and behavioral health evaluation and was being escorted by Deputy R. Ramos from the AFBH booth to solitary holding cell T-23. While walking to the cell, Decedent became fixated on the jail's ceiling-mounted security cameras and made statements about the cameras not working. He was observed mumbling and exhibiting bizarre behavior.

15.     Decedent attempted to quickly move away from Deputy Ramos. This prompted Deputy D. Celestine, who was standing nearby, to run toward Decedent and tackle him into a wall. Deputy Celestine drove his right shoulder into Decedent's abdomen area before slamming him to the floor.

16.     Once on the floor, Decedent was rolled onto his stomach and multiple deputies piled on top of him, holding him in prone restraint. Such a maneuver is highly dangerous for use on a person of Decedent's size and with his medical vulnerabilities. (At the time of Decedent's autopsy three weeks later, the Coroner classified him as morbidly obese and listed his height as 73", weight as 305 pounds, and BMI as 40.) As Decedent was pinned face down on the floor, deputies contorted his body into a "figure four leg lock," a painful control hold. Finally, Decedent was handcuffed, lifted off the ground, and escorted to cell T-23.

17.     As Decedent was being secured in the cell, a mental health clinician approached the group of assembled deputies and indicated there was a lapse in communication between AFBH staff and ACSO deputies at intake. As captured on body-worn camera video, the clinician indicated she had attempted to relay information about Decedent's present psychiatric condition but missed Deputy Ramos during the handoff, as he had prematurely departed the AFBH booth before she could brief him. When the clinician belatedly reported that Decedent was "pretty paranoid," Deputy Celestine laughed and replied, "Oh, that's what that is, I thought I was paranoid," and the whole group of deputies laughed, trivializing the information instead of treating it as clinically significant. This dismissive response foreshadowed the inadequate monitoring and false IOL entries that followed, during which Decedent's medical and psychiatric crisis went unaddressed.

**Monitoring Gap**

18.     Despite Decedent's IOL status requiring direct visual checks every 15 minutes, deputies performed safety checks only sporadically and perfunctorily, failing to conduct consistent direct observations or to engage medical or mental-health staff when Decedent's condition deteriorated.

19.     During this period, Decedent intentionally swallowed his jail-issued plastic ID wristband, an act consistent with his known suicidality and acute psychiatric crisis. He then began choking, bleeding, and aspirating.

20.     At approximately 8:56 p.m., surveillance video captured Decedent collapse to the floor of his cell. He rose briefly to his knees, convulsed, and collapsed again, where he remained in visible distress. Around this time, Deputy M. Jackson approached the cell, briefly looked inside, and then recorded on the IOL that Decedent was "talking." In reality, Decedent was non-verbal, convulsing, and struggling to breathe. Deputy Jackson then walked away without summoning medical assistance.

21.     At approximately 9:16 p.m., Deputy A. Lowe arrived at the cell window. He stood and observed Decedent collapsed on the floor, rolled over and visibly gasping. Deputy Lowe watched him for nearly a full minute, checked his watch, and then walked away, but not before signing an IOL entry using another deputy's initials, imitating the other deputy's handwriting style, and obscuring who actually performed the observation. Deputy Lowe recorded that Decedent was "talking."

22.     Around 9:22 p.m., Deputy Jackson again approached the cell and signed the IOL, this time falsely coding Decedent as "sleeping," despite video evidence showing Decedent still on the floor in medical crisis.

23.     Following these entries, a 52-minute gap elapsed without *any* safety check before Decedent was finally discovered around 10:15 p.m. in critical condition.

24.     ACSO Policy 8.12 required that all IOL observations be direct and accurate, and that any missed checks be documented with a reason and followed by immediate notification of

medical and mental-health staff. No such documentation or notification occurred during this critical period.

**Airway Crisis / Second Use of Force**

25.    At approximately 10:15 p.m., after a 52-minute gap without any safety checks or even cursory observation, Deputy L. Toutai looked through the window of cell T-23 and observed Decedent on the floor in distress. Before opening the cell door, Deputy Toutai called over the radio to request that a nurse respond to the cell due to what he described as "a man bleeding from his mouth."

26.    Deputy Toutai waited 30 seconds for other deputies to arrive on scene. He then opened the cell door and observed Decedent lying on his back, bleeding profusely from his nose and mouth, retching, and thrusting his hand into his mouth in a desperate attempt to clear his airway. The deputies on scene failed to summon emergency medical assistance until a nurse arrived nearly a minute later and finally instructed, "Hey, call a Code 3 emergency response. Just call it. Just call it, call it, call it, call it." Due to the apparent lack of urgency from deputies on scene, the nurse added, "Call it, call it, call it, call it. Right now."

27.    Although Decedent was in obvious medical distress—gasping, retching, and unable to verbally communicate—Defendants DOES 1–50 interpreted his behavior as combative resistance to their authority. Defendants pinned Decedent to the floor, applying downward pressure on his body to prevent any movement while they secured him in ankle restraints and waist-chains, further impeding his ability to breathe.

28.    Even as Decedent convulsed and gasped for air, Defendants DOES 1–50 placed a "Chicago-style" spit hood over his head. ACSO General Order No. 7.16 expressly prohibits spit hood use on individuals experiencing difficulty breathing or bleeding from the mouth or nose

because it restricts airflow. Despite these prohibitions, Defendants forced the hood onto Decedent while he was visibly choking and bleeding.

29.     Medical staff eventually attempted to intervene, but Defendants DOES 1–50 continued to control Decedent by standing on his restraints and holding him prone, obstructing efforts to clear his airway.

30.     Defendants ignored clear signs of medical and psychiatric crisis and instead miscast Decedent's involuntary movements as defiance. One incident report stated he "refused to remove his hand from his mouth," another claimed he "did not comply" with an order not to grab a nurse's shoe, and yet another asserted he "refused to be medically evaluated." In reality, these actions reflected Decedent's desperate struggle to breathe while chained and pressed to the ground. One deputy even wrote that "it was unclear" whether Decedent was "suffering from a mental health crisis, a medical emergency only, or was being assaultive to staff." By unreasonably construing his medical emergency as misconduct, Defendants unreasonably escalated force and compounded his suffering.

31.     While transporting Decedent to the hospital, paramedics identified an obstruction in his airway and used a suction wand to remove it. The obstruction was Decedent's plastic jail-issued ID wristband, which he had apparently removed from his arm and ingested while left unsupervised in holding cell T-23. Following removal of the wristband, Decedent exhibited immediate improvement in respiratory effort.

**Hospitalization and Death**

32.     Decedent was admitted to Stanford Health Care Valley Care Medical Center in Pleasanton in critical condition, suffering from acute respiratory distress syndrome and aspiration

pneumonia. He required endotracheal intubation, prolonged mechanical ventilation, and invasive procedures to drain infectious material from his lung.

33.     Defendants' actions and omissions delayed critical medical intervention and allowed Decedent's airway obstruction to persist. The extended period with the wristband lodged in his throat caused aspiration, which directly seeded bacterial infection. The resulting MRSA pneumonia compounded his already fragile condition and rapidly progressed to sepsis, overwhelming his compromised liver and other organ systems and ultimately causing his death.

34.     Defendants failed to notify Decedent's family that he had been hospitalized and placed in intensive care until nearly 10 days had passed since his medical crisis in custody. During that time, Decedent remained unconscious and in critical condition, and his mother, his young children, and his other family and loved ones were deprived of an opportunity to be present, advocate for his care, or say goodbye.

35.     Despite aggressive critical care, Decedent died in the ICU on June 7, 2022.

**Coroner's Report and Concealment**

36.     The Alameda County Coroner's Bureau conducted an autopsy on June 10, 2022, and certified the cause of death as "complications of alcohol withdrawal." The report failed to identify or describe any specific complications of alcohol withdrawal that could explain Decedent's death.

37.     Defendant COUNTY's autopsy listed hepatic cirrhosis, cardiomegaly, and morbid obesity as "other significant conditions contributing to death," but omitted any reference to Decedent's in-custody respiratory crisis. This omission directly conflicted with hospital records, which documented that Decedent was admitted in critical condition with acute respiratory failure and aspiration pneumonia that cascaded into MRSA infection, sepsis, and multi-organ failure—

conditions treating physicians identified as the proximate causes of his deterioration and death. The Coroner's Bureau possessed these hospital records at the time of its autopsy yet excluded them from the certified cause of death.

38. The Coroner's Investigator's Report likewise minimized custodial responsibility by describing Decedent's hospitalization only as following a "mental health/medical emergency" and a prior "use of force," while omitting any reference to his ingestion of a jail-issued wristband while on IOL status and the resulting airway obstruction and hemorrhaging that sent him to the hospital. This selective reporting obscured the clear link between custodial neglect, aspiration, and fatal infection, and aligned with the autopsy's narrative that removed documented mechanisms of death from the official record.

39. An independent autopsy was performed on August 5, 2022. The examiner documented congested and edematous lungs, hepatomegaly with fibrosis and steatohepatitis, moderate splenomegaly, and acute tubular necrosis in the kidneys. Microscopic sections confirmed congested lung tissue and sepsis-related changes. Although the report noted a right-lung hematoma, it did not identify any significant traumatic injury.

40. The independent examiner did not have access to Decedent's hospital records or clinical microbiology, yet still identified findings consistent with respiratory compromise and systemic infection. By contrast, the Alameda County Coroner's Bureau had those records in its possession but omitted any mention of aspiration, pneumonia, sepsis, or multi-organ failure in the cause of death.

41. Defendant COUNTY's autopsy is fatally compromised by an institutional conflict of interest: the Alameda County Coroner is not an independent medical examiner, but a bureau within ACSO—the very agency that operates SRJ, employed the deputies who ignored and

misdocumented Decedent's medical crisis, and oversaw the neglect that precipitated his death. In effect, ACSO investigated and certified the consequences of its own misconduct. That structural self-policing created an irresistible incentive to minimize custodial fault, explaining why the Coroner ignored documented aspiration, MRSA pneumonia, and septic shock and instead labeled the death a vague "complication of alcohol withdrawal." Because the same command staff controls both jail operations and coroner determinations, the COUNTY autopsy cannot be treated as an impartial medical finding but as a self-serving narrative crafted to shield ACSO from liability.

42.    Taken together, the hospital records and independent autopsy findings demonstrate that Decedent's death resulted from airway obstruction, aspiration, bacterial superinfection, sepsis, and cascading multi-organ failure. By attributing the death solely to "alcohol withdrawal" and disregarding this evidence, the COUNTY's autopsy deliberately mischaracterized the true causes of death. This selective reporting was part of a broader pattern of concealment, compounded by Defendant COUNTY's and ACSO's subsequent refusal to produce body-worn camera videos, unredacted investigative reports, and accurate jail logs.

**Systemic Failures and Prior Notice: Findings from *Babu v. Ahern***

43.    At the time Decedent was booked into SRJ on May 17, 2022, Defendant COUNTY and ACSO were operating under a federal consent decree in *Babu v. Ahern*, Case No. 5:18-cv-07677-NC, following years of litigation exposing unconstitutional conditions at the jail. The *Babu* consent decree, approved by the Court on February 7, 2022, addressed widespread failures in medical and mental health care, disability accommodations, and custody supervision.

44.    Independent experts appointed in *Babu* documented systemic failures in suicide prevention, mental health care, and disability accommodations at SRJ. For example, in her

December 2019 evaluation, Terri McDonald found that the timeliness and quality of required safety checks at SRJ were "insufficient." She reported that COUNTY safety logs contained numerous missing entries or entries so exact on time (e.g., 0700, 0715, 0730, 0745) that it raised questions about their accuracy. McDonald personally observed deputies go more than 45 minutes without completing a mandated safety check, or conducting only cursory walk-bys of darkened cells without shining a flashlight or turning on a light. She further noted incomplete observation logs outside safety cells, and two safety cells occupied by inmates that had no log at all. Staff admitted to her that when they could not meet required timeframes, they simply left safety check logs blank. In at least one attempted suicide review, McDonald observed that staff appeared to have left the unit for over an hour and missed a mandated check during which an inmate attempted suicide. (See McDonald, *Evaluation of the Alameda County Jail System* (Dec. 2019) at 8–9.)

45.     Kerry Hughes, M.D., also documented systemic breakdowns in suicide prevention and mental health care at SRJ. She found that mental health referrals were often delayed or not made when clinically indicated, that custody staff lacked training and tools to respond effectively to psychiatric emergencies, and that suicide prevention relied almost entirely on harsh and punitive safety cells rather than therapeutic care. Inmates reported concealing suicidal thoughts to avoid placement in safety cells, which lacked basic sanitary and humane conditions. Dr. Hughes also found that IOL checks, required every 15 minutes at random intervals, were inadequate in practice: clinical evaluations were too infrequent, suicide risk assessments were insufficient, and prisoners could remain on IOL status indefinitely without meaningful review. (See Hughes, *Evaluation of Mental Health Delivery at the Alameda County Sheriff's Office Santa Rita Jail* (Feb. 2020).)

46.     In April 2021, the U.S. Department of Justice issued findings confirming that Defendant COUNTY was violating the constitutional and statutory rights of detainees at SRJ by failing to provide adequate suicide prevention, monitoring of high-risk inmates, and mental health services, in violation of the Eighth and Fourteenth Amendments and the Americans with Disabilities Act. (See U.S. DOJ Civil Rights Division, *Investigation of the Alameda County, John George Psychiatric Hospital and Santa Rita Jail* (Apr. 22, 2021).)

47.     Despite being under federal court supervision in *Babu*, Defendant COUNTY failed to correct well-documented deficiencies in mental health care, suicide prevention, and disability accommodations at SRJ. Decedent's deterioration and death exemplify the very harms the *Babu* decree was intended to prevent. Although he had expressly reported suicidal thoughts and was placed on IOL status, deputies failed to perform consistent or meaningful checks, permitting a medical emergency to progress unchecked until it spiraled into aspiration, bacterial infection, irreversible organ failure, and death.

48.     These deficiencies were not isolated errors, but the predictable result of a systemic pattern of deliberate indifference to medically vulnerable individuals in custody that constitutes intentional discrimination.

**Late Discovery and Tolling Allegations**

49.     Plaintiffs reallege all paragraphs in this complaint as if fully set forth herein.

50.     Plaintiffs acknowledge that state-law claims against public entities are ordinarily subject to the requirements of the California Government Claims Act, including the six-month filing period under Government Code § 945.6.

51.     Plaintiffs and their family members exercised diligence in seeking information concerning the true nature of Decedent's incarceration and hospitalization beginning in June

2022. On or about June 2, 2022, the Ella Baker Center for Human Rights, a nonprofit public interest organization acting on behalf of Decedent's family, submitted a California Public Records Act request for recordings and records pertinent to Decedent. A true and correct copy of this request is attached hereto as Exhibit D.

52.     On or about March 20, 2025, the Ella Baker Center for Human Rights sent an updated CPRA request on behalf of Decedent's family. A true and correct copy of this request is attached hereto as Exhibit E.

53.     Despite these requests, Defendant COUNTY and ACSO withheld critical evidence—including body-worn camera videos, surveillance videos, and jail records—that were squarely within the County's possession and would have shown that deputies failed in their most basic custodial responsibilities, disregarded a detainee in obvious crisis, and left him convulsing and struggling on the floor for nearly 80 minutes without ever calling for medical assistance.

54.     Meanwhile, the Alameda County Coroner's Bureau, a division of ACSO, certified the death as resulting from vague "complications of alcohol withdrawal" and omitted any mention of acute respiratory failure, aspiration pneumonia, bacterial superinfection, septic shock, or multi-organ failure, despite possessing hospital records documenting those conditions. The Coroner's Investigator's Report likewise described the hospitalization only as following a "mental health/medical emergency" and a prior "use of force," omitting the critical fact that Decedent had ingested a jail-issued wristband and suffered an airway obstruction while on IOL status. These omissions and mischaracterizations affirmatively misled Plaintiffs as to the true circumstances and causes of death.

55.     As a result of Defendants' concealment, Plaintiffs could not have reasonably discovered the factual basis for their amended claims until body-worn camera videos,

surveillance videos, and related jail records were finally produced in discovery in this litigation. Plaintiffs acted promptly once these concealed facts came to light.

56.     Under the doctrines of delayed discovery, fraudulent concealment, and equitable estoppel, Defendants are barred from asserting any limitations defense under Government Code § 945.6. (See *McDonald v. Antelope Valley Cmty. Coll. Dist.*, 45 Cal.4th 88, 102 (2008) [equitable tolling applies to statutory deadlines absent express bar]; *Fox v. Ethicon Endo-Surgery, Inc.*, 35 Cal.4th 797, 807–09 (2005) [delayed discovery rule applies where plaintiff has knowledge of injury but no reason to suspect a wrongful cause; statute runs when plaintiff has reason to suspect both injury and causation].)

57.     Accordingly, Plaintiffs' amended claims are timely and should be adjudicated on the merits.

**CAUSES OF ACTION**

**<u>FIRST CAUSE OF ACTION</u>**

**Violation of Title II of the Americans with Disabilities Act (ADA) (42 U.S.C. § 12132)**

***Against Defendant County of Alameda***

58.     Plaintiff realleges all paragraphs in this complaint as if fully set forth herein.

59.     Defendant COUNTY, through ACSO, receives federal funding for correctional programs, services, and activities at SRJ and is a public entity subject to the requirements of Title II of the ADA. As such, Defendant COUNTY was obligated to ensure that individuals with psychiatric and medical disabilities had meaningful access to said programs, services, and activities. At all relevant times, Decedent was otherwise qualified to participate in or receive the benefits of the programs, services, and activities provided by Defendant COUNTY and ACSO while incarcerated at SRJ.

60.     At the time of Decedent's confinement, Defendant COUNTY had been judicially recognized as operating an unconstitutional jail system through the *Babu* consent decree. Monitor findings confirmed that Defendant COUNTY continued to deny appropriate accommodations to individuals with psychiatric disabilities. Among other deficiencies, Defendants failed to conduct timely screenings, classify disability status, involve qualified mental health professionals in custodial decisions, or implement effective policies for communication and supervision. These systemic failures were the result of discriminatory inaction in the face of known risks to individuals with disabilities. Decedent was denied equal access to medical care, mental health services, and emergency protections, resulting in fatal consequences. These actions were not isolated or accidental, but pursuant to a systemic pattern of deliberate indifference to medically vulnerable individuals in custody that constitutes intentional discrimination.

61.     By the actions and omissions described above, and despite actual and constructive knowledge of Decedent's psychiatric history and active suicidality, Defendant failed to make reasonable accommodations to ensure his safety, access to services, and protection from harm. These failures included, but were not limited to:

(a) Failing to provide adequate monitoring, observation, or placement in a specialized unit appropriate for inmates with psychiatric disabilities;

(b) Failing to ensure staff were trained in interacting with and supervising mentally ill inmates;

(c) Failing to intervene or protect Decedent from dangerous conditions exacerbated by his disabilities;

(d) Employing excessive force and restraint methods that were inappropriate given his psychiatric condition and obvious medical distress; and

(e) Failing to provide timely medical or psychiatric care in response to deteriorating symptoms.

62.    As a foreseeable, direct, and proximate result of Defendant's discriminatory conduct, Decedent was denied the benefits of SRJ's programs, services, and activities, deprived of appropriate medical and psychiatric treatment, and ultimately suffered a preventable death. Despite his active suicidal ideation and IOL status requiring visual checks every 15 minutes, Defendants left him unmonitored for nearly 80 minutes as he struggled alone in his cell and aspirated on his jail wristband. When deputies finally intervened, they treated his obvious medical emergency as misconduct rather than crisis, escalating force instead of providing care. Deprived of timely monitoring, Decedent aspirated a foreign object, developed MRSA pneumonia, spiraled into septic shock, and suffered multi-organ failure—a fatal outcome directly traceable to Defendant COUNTY's well-documented and still-unfixed ADA violations.

63.    Defendant COUNTY's failure to act in the face of known risks constitutes deliberate indifference and intentional discrimination against Decedent on the basis of disability.

64.    Plaintiff I.P.C., as Decedent's successor in interest, seeks all remedies available under Title II of the ADA, including compensatory damages, attorney's fees, and such other relief as the Court deems just and proper.

### SECOND CAUSE OF ACTION

**Violation of Section 504 of the Rehabilitation Act of 1973 (29 U.S.C. § 794)**

***Against Defendant County of Alameda***

65.    Plaintiff realleges all paragraphs in this complaint as if fully set forth herein.

66.    Plaintiff realleges ¶ 59—including Defendant COUNTY's receipt of federal funds, its status as a program or activity covered by § 504, and Decedent's qualification for jail programs and services—and incorporates it here as though fully set forth.

67.     Plaintiff realleges and incorporates by reference the *Babu*-consent-decree notice facts and the specific failures to accommodate—as though fully stated herein. The discriminatory acts and omissions alleged in those paragraphs—namely (i) Defendant COUNTY's ongoing refusal to implement disability-accommodation policies mandated by the *Babu* decree; (ii) the denial of timely screening, effective communication, qualified clinical involvement, and appropriate monitoring; and (iii) the use of excessive force, dangerous restraints, and delayed medical care despite Decedent's known psychiatric and medical disabilities—constitute intentional discrimination and deliberate indifference in violation of Section 504 of the Rehabilitation Act, 29 U.S.C. § 794.

68.     As a foreseeable, direct, and proximate result of Defendant COUNTY's failure to provide reasonable accommodations and its discriminatory denial of meaningful access to jail programs, services, and activities, Decedent was deprived of appropriate medical and psychiatric treatment and ultimately suffered physical and emotional injury followed by preventable death.

69.     Plaintiff I.P.C., as Decedent's successor in interest, seeks all available remedies under the Rehabilitation Act, including compensatory damages, attorney's fees, and any other relief the Court deems just and proper.

### THIRD CAUSE OF ACTION

**Violation of Fourteenth Amendment to the U.S. Constitution (42 U.S.C. § 1983)**

**Deliberate Indifference to Serious Medical Needs**

***Against Defendants Doe Custodial Staff 1–50***

***(with Monell Liability against Defendant County of Alameda)***

70.     Plaintiffs reallege all paragraphs in this complaint as if fully set forth herein.

71.    As a pretrial detainee, Decedent was protected by the Fourteenth Amendment's guarantee of due process, which includes the right to adequate medical care and to be free from deliberate indifference to serious medical needs. This right is violated when a defendant's conduct is objectively unreasonable in light of a known or obvious risk of serious harm.

72.    At all relevant times, Defendants DOES 1–50 knew or had reason to know that Decedent faced a substantial risk of serious harm. Decedent was classified as actively suicidal, placed on an Intensive Observation Log requiring direct checks every 15 minutes, and was exhibiting obvious signs of psychiatric and medical distress.

73.    Despite this knowledge, Defendants failed to take reasonable measures to abate the risk of serious harm. Specific acts and omissions include, but are not limited to:

(a) Failing to conduct required IOL checks for nearly an hour while Decedent was left unsupervised, despite his self-disclosed suicidal ideation;

(b) Failing to summon immediate medical attention despite Decedent exhibiting clear signs of respiratory distress, airway obstruction, and bleeding from the nose and mouth;

(c) Falsifying observation log entries to disguise Decedent's medical crisis, including logging him as "talking" or "sleeping" while he was visibly writhing on the floor in distress; and

(d) Treating Decedent's medical emergency as defiance or resistance by restraining him in a prone position and applying a spit hood to his head despite airway obstruction and profuse bleeding from the nose and mouth.

74.    As a direct and proximate result of Defendants' acts and omissions, Decedent was left unmonitored long enough to swallow his plastic ID wristband and choke on it for over an hour while writhing on the floor and struggling to breathe. The prolonged airway obstruction led

to aspiration, which seeded MRSA pneumonia that rapidly progressed to septic shock, multi-organ failure, and ultimately death.

75.    Plaintiffs seek compensatory damages, punitive damages against the individual Defendants, and attorney's fees pursuant to 42 U.S.C. § 1988.

***Monell* Allegations Against Defendant County of Alameda**

76.    The constitutional and statutory violations alleged herein were the predictable result of Defendant COUNTY's longstanding customs, practices, and failures in jail operations, including but not limited to:

(a) Chronic understaffing and routine non-compliance with IOL safety checks for vulnerable detainees;

(b) A custom of employing spit hoods and high-impact takedowns on detainees exhibiting psychiatric or withdrawal symptoms, contrary to accepted de-escalation practices;

(c) Failure to train and supervise deputies to recognize and promptly treat alcohol-withdrawal emergencies and airway compromise; and

(d) Deliberate falsification and omission in incident reports, jail observation logs, autopsy reports, and death-certificate preparation that conceal custodial contributions to in-custody deaths.

77.    These customs persisted despite the *Babu* consent-decree findings and other notice events, reflecting Defendant COUNTY's deliberate indifference to the risk of recurring harm.

78.    To the extent this *Monell* claim is pleaded in a survival capacity for Decedent's pre-death injuries, Plaintiff pleads equitable-tolling and fraudulent-concealment facts, including:

(a) Defendants withheld body-camera videos and unredacted investigatory materials despite multiple requests by Decedent's family;

(b) Defendant COUNTY's autopsy concealed aspiration and sepsis mechanisms, thwarting diligent investigation; and

(c) Plaintiff acted promptly upon discovery of concealed facts. Such concealment tolls or estops Defendants from asserting any limitations defense.

79.    Accordingly, Plaintiffs seek to impose *Monell* liability in full on their individual claims and on the survival claim insofar as equitable-tolling principles permit.

80.    Plaintiffs are entitled to recover reasonable attorney's fees and costs pursuant to 42 U.S.C. § 1988 and other applicable United States and California laws.

## FOURTH CAUSE OF ACTION

### Wrongful Death (Cal. Code Civ. Proc. § 377.60)

### *Against Defendant County of Alameda*

81.    Plaintiffs reallege all paragraphs in this complaint as if fully set forth herein.

82.    Plaintiffs are the five surviving minor children of Decedent and are the statutory heirs entitled to bring this wrongful death action pursuant to California Code of Civil Procedure § 377.60.

83.    Defendant COUNTY, acting through its ACSO deputies, custody staff, and medical contractors, owed Decedent a duty to exercise reasonable care for his health and safety while confined at SRJ, including the duty to provide timely medical and psychiatric attention, to reasonably monitor his condition, and to use safe and appropriate restraint methods.

84.    Defendant COUNTY and its agents breached these duties by:

(a) Failing to conduct required IOL checks for nearly an hour while Decedent was left

unsupervised, despite his active suicidal ideation;

(b) Failing to summon immediate medical attention despite Decedent exhibiting clear signs of respiratory distress, airway obstruction, and bleeding from the nose and mouth;

(c) Falsifying observation log entries to disguise Decedent's medical crisis, including logging him as "sleeping" or "talking" while he was visibly writhing on the floor in distress;

(d) Applying excessive force and restraint methods, including prone restraint, waist chains, and a spit hood, that foreseeably worsened Decedent's compromised medical and psychiatric state; and

(e) Neglecting to notify Decedent's family for nearly ten days after his hospitalization, thereby depriving him of family support and advocacy.

85.    As a direct and proximate result of Defendant's negligence and wrongful acts, Decedent suffered aspiration pneumonia and MRSA infection, which cascaded into septic shock, multi-organ failure, and ultimately death on June 7, 2022.

86.    Plaintiffs have thereby suffered the wrongful loss of their father's love, companionship, guidance, and financial support, and have sustained damages including loss of care, comfort, society, and support in an amount to be proven at trial.

87.    Plaintiffs seek all damages permitted under California law, including economic and noneconomic damages, funeral and burial expenses, and any other relief the Court deems just and proper.

## FIFTH CAUSE OF ACTION

### Failure to Summon Medical Care (Cal. Gov. Code § 845.6)

### *Against Defendants County of Alameda and Doe Custodial Staff 1–50*

88.    Plaintiffs reallege all paragraphs in this complaint as if fully set forth herein.

89.     At all relevant times, Decedent was in the custody and care of Defendant COUNTY while he was confined at SRJ. Under California Government Code § 845.6, public employees, and the public entity itself, are liable if they know or have reason to know that a prisoner is in need of immediate medical care and fail to take reasonable action to summon such care.

90.     Defendant COUNTY, acting through its custodial staff at SRJ, knew or had reason to know that Decedent required immediate medical care. Decedent was:

(a) Actively suicidal;

(b) On an IOL log requiring safety checks every 15 minutes;

(c) On the floor, in respiratory distress, bleeding from the nose and mouth; and

(d) Left without any safety check for nearly an hour, even after being seen in this state.

91.     Despite obvious and emergent symptoms, Defendants failed to immediately summon emergency medical care. Instead, they falsified observation log entries and delayed appropriate intervention as Decedent suffered in solitary confinement with an obstructed airway.

92.     Defendants' failure to timely summon medical care substantially contributed to Decedent's respiratory distress and aspiration pneumonia, set the stage for MRSA superinfection, and triggered the cascade of sepsis, multi-organ failure, and death.

93.     Plaintiff I.P.C., as Decedent's successor in interest, is entitled to recover damages for Decedent's pre-death pain, suffering, and related losses proximately caused by Defendant COUNTY's violations of Gov. Code § 845.6.

94.     Plaintiffs seek compensatory damages, costs of suit, and any further relief as the Court deems just and proper.

## SIXTH CAUSE OF ACTION

### Negligence (Cal. Code Civ. Proc. § 377.30 – Survival Action)

#### *Against Defendants County of Alameda and Doe Custodial Staff 1–50*

95.     Plaintiff realleges all paragraphs in this complaint as if fully set forth herein.

96.     At all relevant times, Defendant COUNTY, acting through its deputies, custody staff, and medical contractors, and DOES 1–50, owed Decedent a duty to exercise reasonable care for his health and safety while confined at SRJ, including the duty to provide timely medical and psychiatric attention, to reasonably monitor his condition, and to use safe and appropriate restraint methods.

97.     Defendants, and each of them, breached their duty of care, individually and collectively, by acts and omissions including but not limited to:

(a) Failing to conduct required IOL checks for nearly an hour while Decedent was left unsupervised, despite his known psychiatric history and active suicidal ideation;

(b) Failing to summon immediate medical attention despite Decedent exhibiting clear signs of respiratory distress, airway obstruction, and bleeding from the nose and mouth;

(c) Falsifying observation log entries to disguise Decedent's medical crisis, including logging him as "talking" or "sleeping" while he was visibly writhing on the floor in distress;

(d) Applying excessive force and restraint methods, including prone restraint, waist chains, and a spit hood, that foreseeably worsened Decedent's compromised medical and psychiatric state; and

(e) Failing to ensure custodial staff were adequately trained and supervised in monitoring and responding to detainees with serious medical and psychiatric conditions.

98.     Each Defendant acted within the course and scope of employment with Defendant COUNTY. Pursuant to Government Code § 815.2, Defendant COUNTY is vicariously liable for the negligent acts and omissions of its employees and agents.

99.     As a direct and proximate result of Defendants' negligence, Decedent experienced severe physical pain and emotional distress, prolonged respiratory compromise, aspiration pneumonia, and MRSA infection that cascaded into septic shock, multi-organ failure, and death.

100.    Plaintiff I.P.C., as Decedent's successor in interest under Cal. Code Civ. Proc. § 377.30, is entitled to recover all damages Decedent sustained prior to death, including pre-death pain and suffering, medical expenses, and other compensable injuries permitted by California law.

101.    Plaintiff seeks compensatory damages, costs of suit, and such other relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff hereby demands a jury trial on all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request judgment against Defendants as follows:

1.  For compensatory damages in an amount to be proven at trial;

2.  For damages for loss of familial association under 42 U.S.C. § 1983;

3.  For all remedies available under the Americans with Disabilities Act and Rehabilitation Act, including compensatory damages;

4.  For punitive damages against individual Defendants as permitted by law;

5. For injunctive and declaratory relief to prevent recurrence of the violations alleged herein, including systemic reforms in monitoring, psychiatric care, and disability accommodations at Santa Rita Jail;

6. For reasonable attorney's fees and costs pursuant to 42 U.S.C. § 1988, the ADA, the Rehabilitation Act, and California law; and

7. For such other and further relief as the Court deems just and proper.

Respectfully submitted,

LINOWITZ LAW

Dated: November 26, 2025

_____

ZACHARY LINOWITZ
Attorney for Plaintiffs